## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br>**RICHARD A. MILLER,**<br>  Debtor | CHAPTER 13<br><br>NO.: 1:17-bk-02674-RNO |
| **DITECH FINANCIAL, LLC**<br>  Movant | |
| **RICHARD A. MILLER,**<br>  Respondent | |
| **CHARLES J. DEHART, III**<br>  Trustee | |

## MOTION BY DITECH FINANCIAL, LLC, IN ITS CAPACITY AS A SECURED CREDITOR, FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11U.S.C. SECTION 362(D)

DiTech Financial, LLC (hereinafter, "DiTech"), a secured creditor in the above-captioned proceeding, by and through its attorneys, The Granger Firm, presents the following Motion for Relief from the Automatic Stay, respectfully stating in support thereof:

1. Movant is DiTech Financial LLC, formerly known as Green Tree Servicing LLC, with an address of 3000 Bayport Drive, Ste. 880, Tampa, FL 33607.

2. Respondent is Mr. Richard A. Miller (hereinafter, "Mr. Miller"), with a primary residence of 205 Alpat Drive, Dillsburg, PA 17019 (hereinafter, the "Property").

3. Mr. Miller filed a petition under Chapter 13 of the Bankruptcy Code on June 28, 2017.

4. On or about March 17, 2008, Mr. Miller and his wife, Tina M. Miller (hereinafter, "Mrs. Miller") borrowed the sum of $288,000.00 from LBA Financial Group, LLC and executed a promissory note (hereinafter, the "Note") for the same in favor of LBA Financial Group, LLC. *A copy of the Note is attached and incorporated herein*

*as Exhibit "A".*

5.  At the time the Note was executed, title to the Property was deeded to Mr. Miller and Mrs. Miller (collectively, the "Millers"), who were married.

6.  On or about March 17, 2008, and in order to secure the Note executed by Mr. and Mrs. Miller, the Millers granted a mortgage on the Property to MERS, Inc. (Mortgage Electronic Registration Systems, Inc.) as nominee of LBA Financial Group, LLC, which mortgage was recorded on April 7, 2008 in Mortgage Book 1957, Page 2168. *A copy of the recorded mortgage is attached and incorporated herein as Exhibit "B".*

7.  On or about November 11, 2012, MERS, Inc. assigned the same mortgage to CitiMortgage, Inc., and recorded the assignment in the York County Recorder of Deeds on November 8, 2012 in Mortgage Book 2200, Page 7374.

8.  DiTech became the current holder of the mortgage via an assignment from CitiMortgage, Inc., which assignment was recorded in the York County Recorder of Deeds on July 16, 2014 in Mortgage Book 2285, Page 903.

9.  DiTech is the current holder and legal owner of the Note and Mortgage pertaining to the Property, and is entitled to enforce the same. The Mortgage is also referred to herein as the "DiTech Mortgage".

10. DiTech's agreement to accept assignment of the Note was made on the express condition that the Note would be secured by a first mortgage lien on the Property.

11. Prior to closing on the above Mortgage, on March 17, 2008, there also existed of record an Open End Mortgage from Richard A. Miller and Tina M. Miller to Integrity Bank, dated January 29, 2007, and recorded in the York County Recorder of Deeds Office on February 22, 2007 in Mortgage Book 1876, Page 2108 in the amount of

$200,000.00.

12. In order to provide a first lien position for Plaintiff's Mortgage, the title company handling the closing required the $200,000.00 mortgage in favor of Integrity Bank to be satisfied.

13. At closing for DiTech's mortgage, a satisfaction piece for the $200,000.00 mortgage held by Integrity Bank was delivered to the closing agent for the title company handling DiTech's mortgage closing. *A copy of the $200,000.00 mortgage Satisfaction Piece is attached and incorporated herein as Exhibit "C".*

14. The satisfaction piece was duly executed by Integrity Bank, and it was intended by Integrity Bank that the satisfaction piece be recorded.

15. In addition to delivering the $200,000.00 satisfaction piece, Integrity had also closed another line of credit for the Millers in the amount of $100,000.00, resulting in another Open End Mortgage granted by the Millers to Integrity Bank on February 11, 2008, but only recorded by Integrity on March 3, 2008 in Mortgage Book 1950, Page 7228.

16. Understanding the necessity for the Movant's lien to be first priority, Integrity also executed a satisfaction piece for the $100,000.00 Open End Mortgage, and delivered the same to the closing agent for the title company handling DiTech's mortgage closing, with the intention that this satisfaction piece also be recorded. *A copy of the $100,000.00 Satisfaction Piece is attached and incorporated herein as Exhibit "D".*

17. The two Integrity Mortgages are collectively referred to as the "Integrity Mortgages".

18. For reasons unknown to DiTech, the satisfaction pieces were not actually recorded, or if they were, they were mis-indexed and a search of the land records in York County

does not reveal such a recording.

19. S&T Bank is the successor by merger to Integrity Bank.

20. The aforementioned became the subject of a separate Quiet Title Action filed by DiTech on May 8, 2017, in the Court of Common Pleas for York County, Pennsylvania, under docket no. 2017-001249 (hereinafter, the "Quiet Title Action") wherein Richard A. Miller was named as one of the Defendants.[1] *A copy of the Complaint in the Quiet Title Action is attached and incorporated herein as Exhibit "E".*

21. The Quiet Title Action was instituted by DiTech in order to, *inter alia*, determine DiTech's lien priority with regards to the Property, and specifically, to affirm that the DiTech Mortgage is a first priority lien on the Property.

22. S&T bank, as the successor by merger to Integrity Bank, has recently agreed to execute subordination pieces to be recorded to establish of record the superiority of the DiTech liens.

23. §362 of the United States Bankruptcy Code applies the automatic stay to "any act to create, perfect, or enforce" any lien against the property of the debtor (11 U.S.C. §362(a)(5)).

24. To the extent the Quiet Title Action would trigger the application of 11 U.S.C. §362(a)(5)), DiTech is unable to resolve the Quiet Title Action without first obtaining relief from the automatic stay.

---

[1] In addition to Richard A. Miller, DiTech also named Richard A. Miller's wife, Tina M. Miller, and S&T Bank in their capacity as a holder of a separate mortgage on the Property. The Millers were only named in the underlying action to the extent they are or could be considered indispensable parties, as their legal rights are connected with any determination of interest holders in their Property. Accordingly, DiTech does not seek monetary relief against the Millers, and instead only seeks a determination as against S&T Bank that DiTech's mortgage is in fact the first priority lien against the Property.

25. Without the requested relief from the automatic stay, DiTech is therefore unable to perfect its loan on the Property, and thus runs the risk that junior secured creditors may attempt to enforce their own liens in derogation of DiTech's first priority lien.

26. DiTech does not seek relief from the automatic stay for any other reason than to establish its own lien priority of record with regards to the Property via the Quiet Title Action.

27. Accordingly, as there is no recourse sought against Mr. Miller, relief from the automatic stay is not likely to have any impact on the bankruptcy process. *See In re Irwin*, 457 B.R. 413, 426 (Bankr.E.D. Pa. 2011)("[T]he court must compare the equities of freeing the creditor from the restraint of the automatic stay so that it may pursue its claim promptly in another forum, against the impact that such relief is likely to have on the bankruptcy process."); *see also In re Wilson*, 116, F.3d 87, 90 (3d Cir. 1997)(Courts will consider the "totality of the circumstances" when reviewing a motion for relief.)

28. The Pennsylvania Bankruptcy Courts have previously granted relief from the automatic stay to permit separate state court litigation to proceed. *See e.g.*, *In re Kessler*, 430 B.R. 155 (Bankr.M.D. Pa. 2010)(Granting relief from automatic stay so a party can continue with a separate mortgage priority claim); *Graziani v. Randolph*, 2004 PA Super 319, 856 A.2d 1212 (2004)(Granting relief from automatic stay so a party can continue with a separate personal injury claim.).

29. It is necessary for the automatic stay to be lifted so that DiTech may continue its litigation of the Quiet Title Action in order to properly determine its lien priority in the Property, and thus ensure that its interests are properly protected.

WHEREORE, Movant DiTech Financial, LLC respectfully requests this Honorable Court to enter an Order granting relief from the automatic stay, such that the Movant may resolve the Quiet Title Action, including but not limited to the recording a subordination piece between DiTech and S&T Bank, establishing the DiTech Mortgage as the superior mortgage of record to the Integrity Mortgages.

**THE GRANGER FIRM**

Date: 10/3/17              By:    */s/ Blair H. Granger*_____
                                      Blair H. Granger, Esquire
                                      Attorney for Plaintiff

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br>**RICHARD A. MILLER,**<br>        **Debtor** | CHAPTER 13<br><br>NO.: 1:17-bk-02674-RNO |
| **DITECH FINANCIAL, LLC**<br>        **Movant** | |
| **RICHARD A. MILLER,**<br>        **Respondent** | |
| **CHARLES J. DEHART, III**<br>        **Trustee** | |

### CERTIFICATE OF NONCONCURRENCE

The undersigned hereby certifies that counsel for the Movant, DiTech Financial, LLC, conferred with Debtor's Counsel and Trustee with regard to the Motion for Relief from the Automatic Stay, and that as a result of such conference, the Trustee has advised Christopher W. Bopp, Esq. of the Granger Firm that he concurs with the Motion and the relief sought by the Movant. Counsel for the respondents, John M. Hyams, Esq., has advised Christopher W. Bopp, Esq. of the Granger Firm that he does not concur with the Motion, and thus opposes the relief sought herein.

**THE GRANGER FIRM**


Date: 10/3/17        By:    */s/ Blair H. Granger*
                                  Blair H. Granger, Esquire
                                  Attorney for Plaintiff

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br>**RICHARD A. MILLER,**<br>　　　　Debtor | CHAPTER 13<br><br>NO.: 1:17-bk-02674-RNO |
| **DITECH FINANCIAL, LLC**<br>　　　　Movant | |
| **RICHARD A. MILLER,**<br>　　　　Respondent | |
| **CHARLES J. DEHART, III**<br>　　　　Trustee | |

### NOTICE

Notice is hereby given that:

The Movant, Ditech Financial, LLC, filed a Motion for Relief from Automatic Stay on October 3, 2017.

A hearing on the above referenced matter has been scheduled for:

| | |
|---|---|
| **United States Bankruptcy Court:**<br>3rd & Walnut Sts.<br>3rd Fl. Courtroom<br>Harrisburg, PA | **Date:** November 16, 2017<br><br>**Time:** 10:00am |

Any objection/response to the above referenced matter must be filed and served on or before **October 17, 2017.**

If service was properly made and Respondent(s) fail to file an objection/response by the above specified date, the Court **may** determine after review of the Motion that no hearing is required, and grant the relief requested.

If a default order has not been signed and entered, the parties or their counsel are required to appear in Court at the hearing on the above date and time.

　　　　　　　　　　　　　　　　　**THE GRANGER FIRM**
Date: <u>10/3/17</u>　　　　　　　　　*/s/ Blair H. Granger, Esq.*
　　　　　　　　　　　　　　　　　Blair H. Granger, Esq.
　　　　　　　　　　　　　　　　　Attorneys for Ditech Financial, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE:** | CHAPTER 13 |
| **RICHARD A. MILLER,** | |
| **Debtor** | NO.: 1:17-bk-02674-RNO |
| | |
| **DITECH FINANCIAL, LLC** | |
| **Movant** | **MOTION FOR RELIEF FROM** |
| | **AUTOMATIC STAY** |
| **RICHARD A. MILLER,** | |
| **Respondent** | |
| | |
| **CHARLES J. DEHART, III** | |
| **Trustee** | |

### ORDER ON MOTION FOR RELIEF FROM AUTOMATIC STAY

Upon consideration of the Motion for Relief from Automatic Stay filed by the Movant,

Ditech Financial, LLC, and any responses submitted thereto, it is hereby ORDERED and

DECREED that the Motion for Relief from Automatic Stay filed by the Movant, Ditech

Fianncial, LLC is GRANTED, and DiTech is granted leave to proceed with the Quiet Title

Action filed on May 8, 2017, in the Court of Common Pleas for York County, Pennsylvania,

under docket no. 2017-001249 and/or to record a subordination agreement establishing the

DiTech Mortgage as the superior mortgage of record.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br>**RICHARD A. MILLER,**<br>          Debtor<br><br>**DITECH FINANCIAL, LLC**<br>          Movant<br><br>**RICHARD A. MILLER,**<br>          Respondent<br><br>**CHARLES J. DEHART, III**<br>          Trustee | CHAPTER 13<br><br>NO.: 1:17-bk-02674-RNO |

<u>**CERTIFICATE OF SERVICE**</u>

      I, Blair H. Granger, Esq., attorney for Movant, Ditech Financial, LLC, do hereby certify that true and correct copies of the Motion for Relief from Automatic Stay and accompanying Notice has been served on the parties listed below, by the means listed below, and on the dates listed below:

| PARTY | MEANS OF SERVICE | DATE |
|---|---|---|
| John Matthew Hyams, Esq.<br>2023 N. 2nd St.<br>Ste. 110A<br>Harrisburg, PA 17110<br>*Attorney for Debtor* | Via USPS First Class Mail and Electronic Mail:<br><br>jmh@johnhyamslaw.com | 10/3/17 |
| Richard A. Miller<br>205 Alpat Drive<br>Dillsburg, PA 17019<br>*Debtor* | Via USPS First Class Mail | 10/3/17 |

| Charles J. DeHart, III, Esq. James Jones, Esq. 8125 Adams Dr. Hummelstown, PA 17036 *Trustee* | Via USPS First Class Mail and Electronic Mail: dehartstaff@pamd13trustee.com jjones@pamd13trustee.com | 10/3/17 |
| --- | --- | --- |

**THE GRANGER FIRM**

Date: 10/3/17          By:     */s/ Blair H. Granger*
                               Blair H. Granger, Esquire
                               Attorney for Plaintiff

# EXHIBIT "A"

MIN: 100590400050020615       **NOTE**     Loan Number: 002005275602

MARCH 17, 2008                    YORK                        PENNSYLVANIA
     [Date]                         [City]                        [State]

          205 AL PAT DRIVE, DILLSBURG, PENNSYLVANIA 17019
                        [Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 288,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is LBA FINANCIAL GROUP, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on  MAY 1
2008  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  APRIL 1, 2038        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1681 KENNETH ROAD, YORK, PENNSYLVANIA 17408
                                         or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,820.36

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to these changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                               Page 1 of 3

DocMagic *eFORMS* 800-649-1362
www.docmagic.com

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

---

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01

Page 2 of 3

DocMagic *eRauras* 800-649-1362
www.docmagic.com

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RICHARD A. MILLER                -Borrower

_____ (Seal)
TINA X MILLER                    -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                                        -Borrower

[Sign Original Only]

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                         Page 3 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

# EXHIBIT "B"





YORK COUNTY
ASSESSMENT OFFICE

0784817 ✓

This Instrument Prepared By:

After Recording Return To:
LBA FINANCIAL GROUP, LLC
1681 KENNETH ROAD
YORK, PENNSYLVANIA 17408
Loan Number:
002005275602
Uniform Parcel Identifier Number: 67-20-000PC-0015-KO

Property Address:
205 AL PAT DRIVE
DILLSBURG, PENNSYLVANIA
17019

18P
3N

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

**MIN:** 100590400050020615

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   MARCH 17, 2008        , together
with all Riders to this document.
**(B)** "Borrower" is   RICHARD A. MILLER AND TINA K. MILLER, HUSBAND AND
WIFE

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                                        Page 1 of 17

DocMagic *EForms* 800-649-1362
www.docmagic.com

Book **1957** Page **2168**

(D) "**Lender**" is a LBA FINANCIAL GROUP, LLC

Lender is a  PENNSYLVANIA LIMITED LIABILITY COMPANY                organized
and existing under the laws of  PENNSYLVANIA
Lender's address is  1681 KENNETH ROAD, YORK, PENNSYLVANIA 17408

(E) "**Note**" means the promissory note signed by Borrower and dated  MARCH 17, 2008
The Note states that Borrower owes Lender  TWO HUNDRED EIGHTY-EIGHT THOUSAND AND
00/100                          Dollars (U.S. $  288,000.00          ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
APRIL 1, 2038
(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☐ Other(s) [specify] |

(I)  "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.
(J)  "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.
(K)  "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
(L)  "**Escrow Items**" means those items that are described in Section 3.
(M)  "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or

Case 1:17-bk-02674-RNO    Doc 33    Filed 10/03/17    Entered 10/03/17 11:01:58    Desc
Main Document      Page 18 of 83

destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY of YORK :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
A.P.N.: 67-20-000PC-0015-KO

which currently has the address of
205 AL PAT DRIVE
[Street]

DILLSBURG , Pennsylvania 17019 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01 Page 3 of 17

DocMagic *eFexms* 800-649-1362
www.docmagic.com

and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may

be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of

Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an

additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient

to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable,

DocMagic *eFerms* 800-649-1362
www.docmagic.com

notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security

Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security

Case 1:17-bk-02674-RNO    Doc 33    Filed 10/03/17    Entered 10/03/17 11:01:58    Desc
Main Document      Page 26 of 83

Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security

Instrument or the Note which conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                                        Page 12 of 17

DocMagic ✨ 800-649-1362
www.docmagic.com

information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under

Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. **Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. **Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. **Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. **Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                                    Page 14 of 17

DocMagic *eFarms* 800-649-1362
www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

This is a contract under seal and may be enforced under 42 Pa. C.S. Section 5529(b).

_____ (Seal)
RICHARD A. MILLER                -Borrower

_____ (Seal)
TINA X. MILLER                   -Borrower
M.
MM

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

Witness:

_____

Witness:

_____

——————————————— [Space Below This Line For Acknowledgment] ———————————————

COMMONWEALTH OF PENNSYLVANIA )
)  SS:
COUNTY OF _York_ )

On this the __17__ day of __March 2008__ , before me, __Jeanette L. Pennington__ ,

the undersigned officer, personally appeared __RICHARD A. MILLER AND TINA A. MILLER__

_____ ,

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seals.

_____
                                          Signature

_Notary_
                                          Title of Officer

(Notary's Stamp and Embosser)          My commission expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JEANETTE L. PENNINGTON, Notary Public
South Middleton Twp., Cumberland County
My Commission Expires September 10, 2009

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                          Page 16 of 17

DocMagic *eForms* 800-649-1362
www.docmagic.com

## Certificate of Residence of Mortgagee

The undersigned hereby certifies that: (i) he/she is the Mortgagee or the duly authorized attorney or agent of the Mortgagee named in the within instrument; and (ii) Mortgagee's precise residence is:
P.O BOX 2026, FLINT MI 48501

Witness my hand this __17__ day of __March__ __2008__

_____
Signature of Mortgagee or Mortgagee's Duly Authorized Attorney or Agent

Jeanette L. Pennington
_____
Type or Print Name of Mortgagee or Mortgagee's Duly Authorized Attorney or Agent

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01       Page 17 of 17

DocMagic *EForms* 800-649-1362
www.docmagic.com

All that certain tract or parcel of land, located in Carroll Township, York County, Pennsylvania, more particularly bounded and described as follows, to wit:

Beginning at a point on the eastern dedicated right-of-way line of Chestnut Grove Road (T-880), (a thirty-three foot (33') wide legal right-of-way), said point being the southwest corner of the herein described tract; thence from said point of Beginning, by said land now or late of Donald W. and Charlotte P. Perrego North fifty-four degrees five minutes, zero seconds East (N 54° 05' 00" E), a distance of nine hundred and sixty hundredth feet (900.60') to a post; thence by Lot No. 2 of the hereafter mentioned plan South forty-four degrees, fifty-seven minutes, thirty-five seconds East (S 44° 57' 35" E), (erroneously shown as South fifty-one degrees, twenty-three minutes, thirty-five seconds East (S 51° 23' 35" E) on the recorded plan), a distance of two hundred seventy-nine and twenty-six hundredth feet (279.26') to a point on the western dedicated right of way line of Alpat Drive (T-888) ( a fifty foot (50') wide right-of-way); thence by the western dedicated right-of-way line of Alpat Drive the following five (5) courses: 1) South thirty-one degrees, ten minutes, zero seconds West (S 31° 10' 00" W), a distance of five hundred twenty-six and eighty-one hundredth feet (526.81') (erroneously shown as five hundred eleven and thirty-six hundredth feet (511.36') on the recorded plan), to a point; 2) by a curve to the right having a radius of four hundred twenty-five feet (R=425.00'), an arc length of one hundred forty-two and seventy-nine hundredth feet (A/L= 142.79'), having a chord bearing of South forty degrees, forty-seven minutes, thirty seconds West (S 40° 47' 30" W), a chord length of one hundred forty-two and twelve hundredth feet (142.12') to a point; 3) South fifty degrees, twenty-five minutes, zero seconds West (S 50° 25' 00" W), a distance of one hundred eight and fifty-eight hundredth feet (108.58') to a point; 4) by a curve to the right having a radius of two hundred seventy-five hundredth feet (R= 275.00'), an arc length of sixty feet (A/L = 66.00'), having a chord bearing of South fifty-seven degrees, seventeen minutes, thirty seconds West (S 57° 17' 30" W), a chord length of sixty-five and eighty-four hundredth feet (65.84') to a point; 5) South sixty-four degrees ten minutes, zero seconds West (S 64° 10' 00" W), a distance of two hundred twenty-five and forty-hundredth feet (225.40'); thence by a curve to the right connecting the western dedicated right-of-way line of Alpat Drive with the eastern dedicated right-of-way line of Chestnut Grove Road having a radius of twenty-five feet (R = 25.00'), an arc length of forty and eleven hundredth feet (A/L = 40.11') having a chord bearing of North sixty-nine degrees, fifty-two minutes, thirty seconds West (N 69° 52' 30" W), a chord length of thirty-five and ninety-four hundredth feet (35.94') to a point; thence by the eastern dedicated right-of-way line of Chestnut Grove Road North twenty three degrees, fifty-five minutes, zero seconds West (N23° 55' 00"W), a distance of four hundred fifty-seven and fifty-eight hundredth feet (457.58') to a point, the place of Beginning. Said tract contains 10.0000 acres.

Being Lot No. 1 on the "Final Subdivision Plan of Alpat Acres for David E. Myers" as prepared by Hartman and Associates, Inc., Engineers and Surveyors, as recorded in the office of the Recorder of Deeds of and for the County of York, Commonwealth of Pennsylvania, in Plan Book 1843, Page 4273, et seq.

Subject to any and all conditions and / or restrictions shown on the aforementioned plan.

PARCEL 20-000-PC-0015.K0

(200802729.pfd/200802729.PFD/26)

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

|  |  |
|---|---|
| **Borrower:** | Richard A. Miller and Tina A. Miller, husband and wife |
| **Lender:** | LBA Financial Group, Inc. ISAOA |
| **Settlement Agent:** | Lakeside Abstract & Settlements, LLC |
|  | (717)249-0007 |
| **Place of Settlement:** | 101 Front Street, PO Box 426 |
|  | Boiling Springs, PA 17007 |
| **Settlement Date:** | March 17, 2008 |
| **Disbursement Date:** | March 21, 2008 |
| **Property Location:** | 205 Alpat Drive |
|  | Dillsburg, PA 17019 |
|  | York County, Pennsylvania |
|  | 20-000-PC-0015.K0 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
Richard A. Miller

_____
Tina A. Miller

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**EXHIBIT "C"**

Document Prepared by:
  Integrity Bank
  3314 Market Street
  Camp Hill, PA 17011

When Recorded, Return to:
  Integrity Bank
  Attention: Holly Davis
  3314 Market Street
  Camp Hill, PA 17011

### SATISFACTION PIECE

Made this 11 day of March, 2008

Name of Mortgagor: Richard A. Miller

Name of Mortgagee: Integrity Bank

Loan Number: 1397401045

Name of Last Assignee:

Date of Mortgage: 1/29/2007

Original Mortgage Debt: $200,000.00

Mortgage Recorded on 2/22/2007 in the Office of the Recorder of Deeds of York County, PA

Book: 1876 Page: 2108 Instrument Number:

Brief Description or State of Location of Mortgaged Premises:

  Parcel #:                    Municipality:

The undersigned hereby certifies that the debt secured by the above-mentioned mortgage has been fully paid or otherwise discharged and that upon the recording hereof said Mortgage shall be and is hereby fully and forever satisfied and discharged.

The undersigned hereby authorizes and empowers the recorder of said county to enter this satisfaction piece and to cause said mortgage to be satisfied of record. Witness the due execution hereof with the intent to be legally bound.

_____
Holly Davis Agent of Integrity Bank

County of Cumberland, State of Pennsylvania

On  3/11/08  before me, Gina Skidmore, the Undersigned, Notary Public, personally appeared Holly Davis, who acknowledged him/herself to be the Agent of Integrity Bank, a corporation and that he/she as such being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by themselves as such corporate officer.

WITNESS my hand and official seal.          _____
                                             Gina Skidmore, Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Gina Skidmore, Notary Public
Camp Hill Boro, Cumberland County
My Commission Expires May 21, 2011
Member, Pennsylvania Association of Notaries

# EXHIBIT "D"

Document Prepared by:
　　Integrity Bank
　　3314 Market Street
　　Camp Hill, PA 17011

When Recorded, Return to:
　　Integrity Bank
　　Attention: Holly Davis
　　3314 Market Street
　　Camp Hill, PA 17011

## SATISFACTION PIECE

Made this 11 day of March, 2008

Name of Mortgagor: Richard A. Miller

Name of Mortgagee: Integrity Bank

Loan Number: 1397401722

Name of Last Assignee:

Date of Mortgage: 2/11/2008

Original Mortgage Debt: $100,000.00

Mortgage Recorded on　　　　　　　in the Office of the Recorder of Deeds of York County, PA

Book:　　　　Page:　　　　Instrument Number:

Brief Description or State of Location of Mortgaged Premises:

　　　　Parcel #:　　　　　　　　Municipality:

The undersigned hereby certifies that the debt secured by the above-mentioned mortgage has been fully paid or otherwise discharged and that upon the recording hereof said Mortgage shall be and is hereby fully and forever satisfied and discharged.

The undersigned hereby authorizes and empowers the recorder of said county to enter this satisfaction piece and to cause said mortgage to be satisfied of record. Witness the due execution hereof with the intent to be legally bound.

_Holly A. Davis_
Holly Davis Agent of Integrity Bank

County of Cumberland, State of Pennsylvania

On 3/11/08 before me, Gina Skidmore, the Undersigned, Notary Public, personally appeared Holly Davis, who acknowledged him/herself to be the Agent of Integrity Bank, a corporation and that he/she as such being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by themselves as such corporate officer.

WITNESS my hand and official seal.

_Gina Skidmore_
Gina Skidmore, Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Gina Skidmore, Notary Public
Camp Hill Boro, Cumberland County
My Commission Expires May 21, 2011
Member, Pennsylvania Association of Notaries

# EXHIBIT "E"

***THE GRANGER FIRM***
Blair H. Granger, Esquire
Attorney I.D. # 56025
1800 East Lancaster Avenue
Paoli, Pennsylvania 19301
(610) 640-7500

**Ditech Financial LLC**

Attorneys for Plaintiff
COURT OF COMMON PLEAS
YORK COUNTY, PENNSYLVANIA

Plaintiff,

NO.:

v.

Monday, May 8, 2017 2:21 PM

**S&T Bank, successor by merger with
Integrity Bank**

2017-SU-001249

CIVIL ACTION
ACTION TO QUIET TITLE

and

**Richard A. Miller and Tina M. Miller**

Defendants.

RECEIVED
YORK COUNTY PROTHONOTARY
2017 MAY -8 PM 2:03
JUDICIAL CENTER YORK PA

<u>NOTICE</u>

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defense or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS NOTICE TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service of
The York County Bar Association
(Attorney Connections)
York County Bar Center
137 East Market Street
York, Pennsylvania 17401
Telephone No. (717) 854-8755

***THE GRANGER FIRM***
Blair H. Granger, Esquire
Attorney I.D. # 56025
1800 East Lancaster Avenue
Paoli, Pennsylvania 19301
(610) 640-7500                                          Attorneys for Plaintiff

| | |
|---|---|
| **Ditech Financial LLC** | COURT OF COMMON PLEAS<br>YORK COUNTY, PENNSYLVANIA |
|       Plaintiff,<br>v. | NO.: |
| **S&T Bank, successor by merger with Integrity Bank** | CIVIL ACTION<br>ACTION TO QUIET TITLE |
|      and | |
| **Richard A. Miller and Tina M. Miller** | |
|      Defendants. | |

AVISO

Le han demandado a usted en el tribunal. Si usted quiere defenderse de las demandas expuestas en las páginas siguientes, usted debe tomar acción en el plazo de veinte (20) días a partir de la fecha en que se le hizo entrega de la demanda y la notificación, al interponer una comparecencia escrita, en persona o por un abogado y registrando por escrito en el tribunal sus defensas o sus objeciones a las demandas en contra de su persona. Se le advierte que si usted no lo hace, el caso puede proceder sin usted y podría dictarse un fallo por el juez en contra suya sin notificación adicional y podría ser por cualquier dinero reclamado en la demanda o por cualquier otro reclamo o desagravio en la demanda solicitado por el demandante. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

USTED DEBE LLEVARLE ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O NO PUEDE CORRER CON LOS GASTOS DE UNO, VAYA O LLAME POR TELEFONO A LA OFICINA EXPUESTA ABAJO. ESTA OFICINA PUEDE POVEERLE INFORMACION RESPECTO A COMO CONTRATAR A UN ABOGADO.


SI NO PUEDE CORRER CON LOS GASTOS PARA CONTRATAR A UN ABOGADO, ESTA OFICINA PUDIERA PROVEERLE INFORMACION RESPECTO A INSTITUCIONES QUE PUEDAN OFRECER SERVICIOS LEGALES A PERSONAS QUE CALIFICAN PARA LA REDUCCION DE HONORARIOS O QUE NO TENGAN QUE PAGAR HONORARIOS

Lawyer Referral Service of
The York County Bar Association
(Attorney Connections)
York County Bar Center
137 East Market Street
York, Pennsylvania 17401
Telephone No. (717) 854-8755

***THE GRANGER FIRM***
Blair H. Granger, Esquire
Attorney I.D. # 56025
1800 East Lancaster Avenue
Paoli, Pennsylvania 19301
(610) 640-7500

Attorneys for Plaintiff

**Ditech Financial LLC**

   **Plaintiff,**

v.

**S&T Bank, successor by merger with Integrity Bank**

   and

**Richard A. Miller and Tina M. Miller**

   Defendants.

COURT OF COMMON PLEAS
YORK COUNTY, PENNSYLVANIA

NO.:  Monday, May 8, 2017 2:21 PM

   2017-SU-001249

CIVIL ACTION
ACTION TO QUIET TITLE

RECEIVED
2017 MAY -8 PM 2:04
YORK COUNTY PROTHONOTARY
JUDICIAL CENTER YORK PA

## COMPLAINT

1.  Plaintiff is DiTech Financial LLC formerly known as Green Tree Servicing LLC with an address of 3000 Bayport Drive, Suite 880, Tampa, FL 33607.

2.  Defendant S&T Bank is a banking institution with offices located at 355 N. 5th Street, Indiana, Pennsylvania 15701.

3.  Defendant S&T Bank is the successor by merger to Integrity Bank.

4.  Defendants Richard A. Miller and Tina M. Miller are husband and wife with a last known address of 205 Alpat Drive, Dillsburg, PA 17019.

5.  The Millers own the real property known as 205 Alpat Drive, Dillsburg, PA 17019 (the "Property"), which Property is located in York County, Pennsylvania.

6.  On or about March 17, 2008, the Millers borrowed the sum of $288,000.00 from LBA Financial Group, LLC and executed a promissory note for the same in favor of LBA Financial Group, LLC. *A copy of the Note is attached as Exhibit "A".*

7.      Also on or about March 17, 2008, as security for the Note, the Millers granted a mortgage (the "Plaintiff's Mortgage") on the Property to MERS, Inc. (Mortgage Electronic Registration Systems, Inc.) as nominee for LBA Financial Group, LLC, which mortgage was recorded in the York County Recorder of Deeds on April 7, 2008 in Mortgage Book 1957, Page 2168.   *A copy of the recorded Plaintiff's Mortgage is attached and incorporated herein as Exhibit "B".*

8.      Thereafter, MERS assigned the Mortgage to CitiMortgage, Inc. on or about November 11, 2012 and  recorded the assignment in the York County Recorder of Deeds on November 8, 2012 in Mortgage Book 2200, Page 7374.

9.      Thereafter, CitiMortgage, Inc. assigned the Mortgage to Plaintiff on or about July 15, 2014 and recorded the assignment in the York County Recorder of Deeds on July 16, 2014 in Mortgage Book 2285, Page 903.

10.     Plaintiff is the current holder and legal owner of the Note and Mortgage and entitled to enforce the same.

11.     The Plaintiff's loan of $228,000.00 was made to the Millers on the express condition that it would be secured by a first mortgage lien on the Property.

12.     The Millers were aware that the Plaintiff's Mortgage had to be a first mortgage lien and that there could be no subordinate financing.

13.     Prior to the closing on the above mortgage, there existed of record a mortgage in favor of MERS as nominee for American Home Bank N.A. dated October 25, 2006 and recorded in the York County Recorder of Deeds Office November 27, 2006 in Book 1857, Page 3535 in the principal amount of $180,000.00.

14.     Plaintiff required, in order for it to have a first lien position that the mortgage in favor of American Home Bank, serviced and/or held at the time by US Bank Home Mortgage, be paid off.  In fact, the closing instructions from the lender to the title company handling the closing states as follows:

### ADDENDUM TO CLOSING INSTRUCTIONS
(Additional conditions to be satisfied prior to disbursement of loan proceeds)

```
NO SUBORDINATE FINANCING
HUD 1 TO SHOW PAYOFF OF US BK HM MTG $175130, SUSQ BNK #8244
$19447
COPY OF CURRENT PAYOFF DEMANDS FOR ALL LIENS
EXECUTED PATRIOT ACT DISCLOSURE
```

15.     On the Closing Statement for the Mortgage, the amount of $176,868.13 was paid to US Bank Home Mortgage to pay off and clear the mortgage granted to American Home Bank. *See line 1520 of the Closing Statement attached as Exhibit "C" hereto.*

16.     Prior to the closing on the above Mortgage, on March 17, 2008, there also existed of record an Open End Mortgage from Richard A. Miller and Tina M. Miller to Integrity Bank dated January 29, 2007 and recorded in the York County Recorder of Deeds Office on February 22, 2007 in Mortgage Book 1876, Page 2108 in the amount of $200,000.00.

17.     The Open End Mortgage held by Integrity Bank was a junior mortgage of record when granted.

18.     In order to provide a first lien position for Plaintiff's Mortgage, the title company handling the closing required a release of the $200,000.00 mortgage in favor of Integrity.  The title commitment issued for the closing contained the following requirement:

Release of Mortgage executed by Richard A. Miller and Tina M. Miller, husband and wife, to Integrity Bank, dated January 29, 2007 and record February 22, 2007 in Book 1876, Page 2108, York County, securing the principal sum of $200,000.00. (Open end)

19.     Prior to closing on the Plaintiff's Mortgage, and in order to obtain a release of the $200,000.00 Open End Mortgage held by Integrity, the title company handling the closing for the Plaintiff's Mortgage, Lakeside Abstract & Settlement, LLC, contacted Integrity Bank to obtain a release of the $200,000.00 mortgage.

20.     On March 14, 2008, the individual at Lakeside Abstract & Settlement handling the closing for the Plaintiff's Mortgage, Jeannette Pennington, wrote the following email to document a conversation she had had with Integrity Bank regarding the $200,000.00 Open End Mortgage, wherein Integrity agreed to release its mortgage to facilitate the closing for the Plaintiff's Mortgage.  The email was as follows:

```
-----Original Message-----
From: Jeanette Pennington [mailto:jeanette@lakesideabstract.com]
Sent: Friday, March 14, 2008 3:37 PM
To: 'Trisha'
Subject: RE: Richard Miller

Will do.
I also talked to Integrity Bank and they are releasing the mortgage versus the subordination.
Any idea when this is closing??
Jeanette

Lakeside Abstract & Settlements, LLC.
101 Front Street, PO Box 426
Boiling Springs, PA 17007
Jeanette L. Pennington, Owner /Title Agent
Phone #717-249-0007 Fax #717-249-0080
```

21. Thereafter, at the closing for Plaintiff's Mortgage, a satisfaction piece for the $200,000.00 Open End Mortgage held by Integrity was delivered to Ms. Pennington.  *A copy of the Satisfaction Piece is attached as Exhibit "D" hereto.*

22. The satisfaction piece delivered to the title company was duly executed by Integrity Bank and is entitled to be enforced as between Integrity and Plaintiff.

23. The closing for the Plaintiff's Mortgage would not have been completed by Lakeside Abstract and Settlement if not for the delivery of the satisfaction piece by Integrity Bank.

24. In fact, on information and belief, the delivery of the satisfaction piece was part of the ongoing business dealings Mr. Miller had with Integrity at the time, wherein Integrity was providing financing for Mr. Miller's building business, including a line of credit secured by the $200,000.00 mortgage.

25. At the time the $200,000.00 Open Ended Mortgage was granted by Integrity, it was junior in time to the then existing $180,000.00 mortgage held by American Home Bank.

26. As set forth above, Plaintiff's mortgage paid off the American Home Bank mortgage, on the basis that it would assume the first lien priority of American Home Bank.

27. Integrity was aware of the closing by the Millers for the Plaintiff's Mortgage and understood the requirement for Plaintiff's Mortgage to be in first lien position.

28. In fact, in addition to delivering the Satisfaction Piece for the $200,000.00 Integrity Mortgage, Integrity knew that it had recently closed another line of credit for the Millers in the amount of $100,000.00, resulting in another Open End Mortgage being granted by the Millers to Integrity Bank on February 11, 2008, but only recorded by Integrity Bank on March 3, 2008 in Mortgage Book: 1950, Page 7228.

29. The $100,000.00 Open End Mortgage recorded on March 3, 2008 was junior to the then existing American Home Bank Mortgage and the $200,000.00 Integrity Mortgage.

30. The recording of the $100,000.00 mortgage was so close to the date of closing for the Plaintiff's Mortgage that it did not appear on the title search performed by the title company.

31. Nonetheless, and fully understanding the necessity for the Plaintiff's Mortgage to be a

first lien, on March 7, 2008 Integrity executed a satisfaction piece for the $100,000.00 Open End Mortgage it held and delivered the same to Lakeside Abstract & Settlement in anticipation of the closing for the Plaintiff's Mortgage. *A copy of this Satisfaction Piece is attached as Exhibit "E" hereto.*

32. Indeed, the satisfaction piece executed by Integrity for the $100,000.00 Open End Mortgage was executed only days after the mortgage itself had been recorded, resulting in Integrity not yet having the recorded mortgage back in its possession and unable to even include the recording information on the Satisfaction Piece.

33. On information and belief, Integrity was told by the Millers that they would execute new loan documents in favor of Integrity, to be recorded after the Plaintiff's Mortgage was closed and recorded, so that the seniority of the Plaintiff's Mortgage was assured.

34. In fact, the Millers did execute new loan documents in favor of Integrity at the same date as the Plaintiff's Mortgage closing, which were later recorded by Integrity after the Plaintiff's Mortgage was recorded as follows:

> Richard A. Miller and Tina M. Miller To Integrity Bank (3345 Market Street, Camp Hill, PA 17011), Dated: 03/17/2008, Recorded: 11/10/2008, Mortgage Book: 1993, Page 131 in the amount of $200,000.00 (OPEN-ENDED)

> Richard A. Miller and Tina M. Miller To Integrity Bank (3345 Market Street, Camp Hill, PA 17011), Dated: 03/17/2008, Recorded: 11/10/2008, Mortgage Book: 1993, Page 145 in the amount of $100,000.00 (OPEN-ENDED)

.

35. These two mortgages, executed on the same day as the closing for the Plaintiff's Mortgage and in amounts identical to the, then, existing open end mortgages held by Integrity, were executed to replace the two existing open-end mortgages and allow the Plaintiff's Mortgage to be recorded senior of record to the Integrity mortgages.

36. For reasons unbeknownst, the original documents were not actually recorded, or if they were recorded, they were mis-indexed. In any event, a search of the land records in York County does not reveal the Satisfaction Pieces were recorded.

37. The Millers are named herein as the owners of the Property. No relief is sought against them.

### Count I - Action to Quiet Title, Pa.R.C.P. 1061(b)(2) and (3)

38. The above paragraphs are incorporated herein by reference.

39. Pa.R.C.P. 1062(b)(2) permits a party to bring an action to quiet title "to determine any right, lien, title or interest in the land or determine the validity or discharge of any document, obligation or deed affecting any right, lien, title or interest in land".

40. Pa.R.C.P. 1062(b)(3) permits a party to bring an action to quiet title "to compel an adverse party to file, record, cancel, surrender or satisfy of record, or admit the validity, invalidity or discharge of, any document, obligation or deed affecting any right, lien, title or interest in land".

41. Defendant S&T Bank has been asked to re-execute original satisfaction pieces for the $200,000.00 Open End Mortgage that was recorded on February 22, 2007 in Mortgage Book 1876, Page 2108 and the $100,000.00 Open End Mortgage that was recorded on March 3, 2008 in Mortgage Book: 1950, Page 7228.

42. Defendant S&T Bank has refused to cooperate in signing and recording a replacement satisfaction pieces and is instead taking the position that at least the $100,000.00 Integrity Mortgage remains valid, enforceable and senior to Plaintiff's Mortgage.

43. All parties intended for the Plaintiff's Mortgage to be senior to all other mortgages on the Property at the time the Plaintiff's Mortgage was granted.

44. However, because the original satisfaction pieces were either lost or not recorded and/or mis-indexed, of record Plaintiff's Mortgage is not senior.

45. On September 24, 2015, S&T Bank filed a foreclosure action against the Millers in York County under docket number 2015 SU 003171-06.

46. Defendant S&T Bank is trying to take advantage of the lack of recording of the Satisfaction Pieces for the $200,000.00 and $100,000.00 Open End Mortgages referenced in this Count, despite Integrity Bank executing a Satisfaction Piece for the same.

47. As between Plaintiff and Defendant, S&T Bank, the lack of recording of the satisfaction pieces as set forth herein is irrelevant.

48. Plaintiff is entitled to have it judicially determined that the Integrity Mortgages, as referenced in this Count, should be satisfied of record or released of record, so that the seniority of the Plaintiff's Mortgage is established and assured.

49. In the alternative, Plaintiff is entitled to be equitably subrogated to the position of the American Home Bank Mortgage that its mortgage is paid off and but for which the Integrity Bank mortgages referenced in this Count would still be junior to.

WHEREFORE, Plaintiff respectfully demands that this Court enter judgment in its favor and against the Defendants, and Order that:

a) the Plaintiff's Mortgage is a valid and enforceable senior mortgage on the Property as against Defendant S&T Bank's interests;

b) the Recorder of Deeds of York County be instructed to record and index a copy of the satisfaction pieces attached as Exhibit "D" and Exhibit "E" for the two Integrity Mortgages as though it was an original and that the copy shall be given the same force and effect as though an original;

c) In the alternative, Plaintiff's Mortgage be equitably subrogated to the American Home Bank mortgage referenced above and/or an equitable lien granted with the same priority date as the closing date for the Plaintiff's Mortgage at which the American Home Bank mortgage was paid off;

d) a copy of said Order be recorded and indexed in the Recorder of Deeds of York County under the name of all parties hereto;

e) any other such relief as the Court deems appropriate and just.

### Count II – Declaratory Judgment

50. The above paragraphs are incorporated herein by reference.

51. A controversy exists between the Plaintiff and the Defendants.

52. Plaintiff is entitled to have it judicially determined that the Integrity Mortgages, as referenced in this Count, should be satisfied of record or released of record, so that the seniority of the Plaintiff's Mortgage is established and assured.

53. In the alternative, Plaintiff is entitled to be equitably subrogated to the position of the American Home Bank Mortgage that its mortgage is paid off and but for which the Integrity Bank mortgages referenced in this Count would still be junior to.

WHEREFORE, Plaintiff respectfully demands that this Court enter judgment in its favor and against the Defendants, and Order that:

a) the Plaintiff's Mortgage is a valid and enforceable senior mortgage on the Property as against Defendant S&T Bank's interests;

b) the Recorder of Deeds of York County be instructed to record and index a copy of the satisfaction pieces attached as Exhibit "D" and Exhibit "E" for the two Integrity

Mortgages as though it was an original and that the copy shall be given the same force and effect as though an original;

c) in the alternative, Plaintiff's Mortgage be equitably subrogated to the American Home Bank mortgage referenced above and/or an equitable lien granted with the same priority date as the closing date for the Plaintiff's Mortgage at which the American Home Bank mortgage was paid off;

d) a copy of said Order be recorded and indexed in the Recorder of Deeds of York County under the name of all parties hereto;

e) any other such relief as the Court deems appropriate and just.

**THE GRANGER FIRM**

Date:            By:    _____
                             Blair H. Granger, Esquire
                             Attorney for Plaintiff

**EXHIBIT "A"**

MIN: 100590400050020615    **NOTE**    Loan Number: 002005275602

MARCH 17, 2008                    YORK                    PENNSYLVANIA
  [Date]                         [City]                      [State]

205 AL PAT DRIVE, DILLSBURG, PENNSYLVANIA 17019
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 288,000.00         (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is LBA FINANCIAL GROUP, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on  MAY 1
2008  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  APRIL 1, 2038           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1681 KENNETH ROAD, YORK, PENNSYLVANIA
17408
                                             or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,820.36

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to these changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

---

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                              Page 1 of 3

DocMagic *eFpπππ®* 800-649-1362
www.docmagic.com

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RICHARD A. MILLER              -Borrower

_____ (Seal)
TINA  M  MILLER               -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                                        -Borrower

[Sign Original Only]

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                           Page 3 of 3

DocMagic *eFarms* 800-649-1362
www.docmagic.com

# EXHIBIT "B"




YORK COUNTY
ASSESSMENT OFFICE

0784817

This Instrument Prepared By:



After Recording Return To:
LBA FINANCIAL GROUP, LLC
1681 KENNETH ROAD
YORK, PENNSYLVANIA 17408
Loan Number:
002005275602
Uniform Parcel Identifier Number: 67-20-000PC-0015-KO

Property Address:
205 AL PAT DRIVE
DILLSBURG, PENNSYLVANIA
17019

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

**MIN:** 100590400050020615

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated MARCH 17, 2008 , together with all Riders to this document.
**(B)** "Borrower" is RICHARD A. MILLER AND TINA K. MILLER, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                    Page 1 of 17

DocMagic *eForms* 800-649-1362
www.docmagic.com

Book **1957** Page **2168**

(D) "Lender" is LBA FINANCIAL GROUP, LLC

Lender is a PENNSYLVANIA LIMITED LIABILITY COMPANY organized
and existing under the laws of PENNSYLVANIA
Lender's address is 1681 KENNETH ROAD, YORK, PENNSYLVANIA 17408

(E) "Note" means the promissory note signed by Borrower and dated MARCH 17, 2008
The Note states that Borrower owes Lender TWO HUNDRED EIGHTY-EIGHT THOUSAND AND
00/100 Dollars (U.S. $ 288,000.00 ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
APRIL 1, 2038
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider    ☐ Planned Unit Development Rider
☐ Balloon Rider            ☐ Biweekly Payment Rider
☐ 1-4 Family Rider         ☐ Second Home Rider
☐ Condominium Rider        ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or

destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

|  COUNTY | of | YORK | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
A.P.N.: 67-20-000PC-0015-KO

which currently has the address of

205 AL PAT DRIVE
[Street]

DILLSBURG           , Pennsylvania      17019       ("Property Address"):
[City]                                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose

and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may

be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of

Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an

additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient

to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable,

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                    Page 8 of 17

DocMagic *eF5mmm* 800-649-1362
www.docmagic.com

notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security

Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security

Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security

Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other

information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under

Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. **Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. **Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. **Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. **Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

Case 1:17-bk-02674-RNO    Doc 33    Filed 10/03/17    Entered 10/03/17 11:01:58    Desc
Main Document      Page 72 of 83

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

This is a contract under seal and may be enforced under 42 Pa. C.S. Section 5529(b).

_____ (Seal)
RICHARD A. MILLER          -Borrower

_____ (Seal)
TINA K. MILLER             -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Witness:

_____

Witness:

_____

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                    Page 15 of 17

DocMagic *eFarms* 800-649-1362
www.docmagic.com

———————————— [Space Below This Line For Acknowledgment] ————————————

COMMONWEALTH OF PENNSYLVANIA )
                              ) SS:
COUNTY OF _York_              )

On this the _17_ day of _March 2008_ , before me, _Jeanette L. Pennington_ ,

the undersigned officer, personally appeared __RICHARD A. MILLER AND TINA A. MILLER__

_____,

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seals.

_____
                                Signature

_Notary_
_____
                                Title of Officer

(Notary's Stamp and Embosser)        My commission expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JEANETTE L. PENNINGTON, Notary Public
South Middleton Twp., Cumberland County
My Commission Expires September 10, 2009

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                    Page 16 of 17

DocMagic *eForms* 800-649-1362
www.docmagic.com

<u>Certificate of Residence of Mortgagee</u>

The undersigned hereby certifies that: (i) he/she is the Mortgagee or the duly authorized attorney or agent of the Mortgagee named in the within instrument; and (ii) Mortgagee's precise residence is:
P.O BOX 2026, FLINT MI 48501

Witness my hand this __17__ day of __March__ __2008__

_____
Signature of Mortgagee or Mortgagee's Duly Authorized Attorney or Agent

Jeanette L. Pennington
_____
Type or Print Name of Mortgagee or Mortgagee's Duly Authorized Attorney or Agent

PENNSYLVANIA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3039 01/01                                    Page 17 of 17

DocMagic ℮Ϝⱁⱃⱞⱖ 800-649-1362
www.docmagic.com

All that certain tract or parcel of land, located in Carroll Township, York County, Pennsylvania, more particularly bounded and described as follows, to wit:

Beginning at a point on the eastern dedicated right-of-way line of Chestnut Grove Road (T-880), (a thirty-three foot (33') wide legal right-of-way), said point being the southwest corner of the herein described tract; thence from said point of Beginning, by said land now or late of Donald W. and Charlotte P. Perrego North fifty-four degrees five minutes, zero seconds East (N 54° 05' 00" E), a distance of nine hundred and sixty hundredth feet (900.60') to a post; thence by Lot No. 2 of the hereafter mentioned plan South forty-four degrees, fifty-seven minutes, thirty-five seconds East (S 44° 57' 35" E), (erroneously shown as South fifty-one degrees, twenty-three minutes, thirty-five seconds East (S 51° 23' 35" E) on the recorded plan), a distance of two hundred seventy-nine and twenty-six hundredth feet (279.26') to a point on the western dedicated right of way line of Alpat Drive (T-888) ( a fifty foot (50') wide right-of-way); thence by the western dedicated right-of-way line of Alpat Drive the following five (5) courses: 1) South thirty-one degrees, ten minutes, zero seconds West (S 31° 10' 00" W), a distance of five hundred twenty-six and eighty-one hundredth feet (526.81') (erroneously shown as five hundred eleven and thirty-six hundredth feet (511.36') on the recorded plan), to a point; 2) by a curve to the right having a radius of four hundred twenty-five feet (R=425.00'), an arc length of one hundred forty-two and seventy-nine hundredth feet (A/L= 142.79'), having a chord bearing of South forty degrees, forty-seven minutes, thirty seconds West (S 40° 47' 30" W), a chord length of one hundred forty-two and twelve hundredth feet (142.12') to a point; 3) South fifty degrees, twenty-five minutes, zero seconds West (S 50° 25' 00" W), a distance of one hundred eight and fifty-eight hundredth feet (108.58') to a point; 4) by a curve to the right having a radius of two hundred seventy-five hundredth feet (R= 275.00'), an arc length of sixty feet (A/L = 66.00'), having a chord bearing of South fifty-seven degrees, seventeen minutes, thirty seconds West (S 57° 17' 30" W), a chord length of sixty-five and eighty-four hundredth feet (65.84') to a point; 5) South sixty-four degrees ten minutes, zero seconds West (S 64° 10' 00" W), a distance of two hundred twenty-five and forty-hundredth feet (225.40'); thence by a curve to the right connecting the western dedicated right-of-way line of Alpat Drive with the eastern dedicated right-of-way line of Chestnut Grove Road having a radius of twenty-five feet (R = 25.00'), an arc length of forty and eleven hundredth feet (A/L = 40.11') having a chord bearing of North sixty-nine degrees, fifty-two minutes, thirty seconds West (N 69° 52' 30" W), a chord length of thirty-five and ninety-four hundredth feet (35.94') to a point; thence by the eastern dedicated right-of-way line of Chestnut Grove Road North twenty three degrees, fifty-five minutes, zero seconds West (N23° 55' 00"W), a distance of four hundred fifty-seven and fifty-eight hundredth feet (457.58') to a point, the place of Beginning. Said tract contains 10.0000 acres.

Being Lot No. 1 on the "Final Subdivision Plan of Alpat Acres for David E. Myers" as prepared by Hartman and Associates, Inc., Engineers and Surveyors, as recorded in the office of the Recorder of Deeds of and for the County of York, Commonwealth of Pennsylvania, in Plan Book 1843, Page 4273, et seq.

Subject to any and all conditions and / or restrictions shown on the aforementioned plan.

PARCEL 20-000-PC-0015.K0

(200802729.pfd/200802729.PFD/26)

# EXHIBIT "C"

**A.  U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**
## SETTLEMENT STATEMENT
Optional Form for Transactions without Sellers

| NAME AND ADDRESS OF BORROWER: | NAME AND ADDRESS OF LENDER: |
|---|---|
| Richard A. Miller<br>Tina M. Miller<br>205 Alpat Drive<br>Dillsburg, PA 17019 | LBA Financial Group, Inc.<br>ISAOA<br>1681 Kenneth Road<br>York, PA 17408 |

| PROPERTY LOCATION: | SETTLEMENT AGENT: | Lakeside Abstract & Settlements, LLC |
|---|---|---|
| 205 Alpat Drive<br>Dillsburg, PA 17019<br>York County, Pennsylvania<br>20-000-PC-0015.K0 | PLACE OF SETTLEMENT: | 101 Front Street, PO Box 426<br>Boiling Springs, PA 17007 |
| | SETTLEMENT DATE: | March 17, 2008      Disburse:03/21/08 |
| | LOAN NUMBER: | 002005275602 |

| L. SETTLEMENT CHARGES | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|
| *800. ITEMS PAYABLE IN CONNECTION WITH LOAN* | | | 1501. Account Payoff        to<br>Susquehanna Bank | 19,692.87 |
| 801. Loan Origination Fee | % to | | 1502. | |
| 802. Loan Discount | % to | | | |
| 803. Appraisal Fee | to Connor Appraisal | 300.00 | 1503. | |
| 804. Commitment Fee | to LBA Financial Group, Inc. ISAOA | 695.00 | | |
| 805. Credit Report | to Yorktown Funding, Inc. | 15.66 | 1504. | |
| 806. Processing Fee | to Yorktown Funding, Inc. | 450.00 | | |
| 807. Broker Comp PD By Lender | to Yorktown Funding, Inc.          POC:L4086.72 | | 1505. | |
| 808. | | | | |
| 809. | | | 1506. | |
| 810. | | | | |
| 811. | | | 1507. | |
| 812. | | | | |
| 813. | | | 1508. | |
| 814. | | | | |
| 815. | | | 1509. | |
| 816. | | | | |
| 817. | | | 1510. | |
| 818. | | | | |
| 819. | | | 1511. | |
| 820. | | | | |
| *900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE* | | | 1512. | |
| 901. Interest  03/21/08  to  04/01/08   @ $      52.000000/day | | 572.00 | | |
| 902. Mortgage Insurance Prem for           months to | | | 1513. Mortgage Payoff        to<br>US Bank Home Mortga | 176,868.13 |
| 903. Hazard Insurance Prem for      1.0 yr to | | | | |
| 904. | | | 1514. | |
| 905. | | | | |
| *1000. RESERVES DEPOSITED WITH LENDER* | | | 1520. TOTAL DISBURSED<br>(enter on line 1603) | 196,561.00 |
| 1001. Hazard Insurance | months @ $      per month | | | |
| 1002. Mortgage Insurance | months @ $      per month | | | |
| 1003. City/Town Taxes | months @ $      per month | | | |
| 1004. County Taxes | months @ $      per month | | | |
| 1005. School Taxes | months @ $      per month | | | |
| 1006. | months @ $      per month | | | |
| 1007. | months @ $      per month | | | |
| 1008. Aggregate Adjustment | months @ $      per month | 0.00 | | |
| *1100. TITLE CHARGES* | | | | |
| 1101. Settlement Fee | to | | | |
| 1102. Title Search | to | | | |
| 1103. Title Examination | to | | | |
| 1104. Title Ins. Binder | to | | | |
| 1105. Document Prep. | to | | | |
| 1106. Notary Fees | to                               NO CHARGE | | | |
| 1107. Attorney's Fees | to | | | |
| (includes above item numbers: | ) | | | |
| 1108.  Title Insurance | to Lakeside Abstract & Settlements, L 70% Re-issue | 1,133.21 | | |
| (includes above item numbers: | ) | | | |
| 1109.  Lender's Coverage   $        288,000.00        1,133.21 | | | | |
| 1110.  Owner's Coverage   $ | | | | |
| 1111. ALTA Endorsements | to Lakeside Abstract & Settlements, L  100, 300, 8.1 | 150.00 | | |
| 1112. Closing Protection Letter | to First American Title Insurance Com | 35.00 | N.   NET SETTLEMENT | |
| 1113. | | | | |
| 1114. Wire Fee | to Lakeside Abstract & Settlements, L | 15.00 | 1600.  Loan Amount | $      288,000.00 |
| 1115. Overnight Delivery | to Lakeside Abstract & Settlements, L | 36.00 | | |
| 1116. | | | 1601.  Plus Cash/Check from<br>Borrower | $      0.00 |
| 1117. | | | | |
| 1118. | | | | |
| *1200. GOVERNMENT RECORDING AND TRANSFER CHARGES* | | | 1602.  Minus Total Settlement<br>Charges (line 1400) | $      10,236.93 |
| 1201. Recording fees: Mortgage $      68.00  ; Releases $ | | 68.00 | | |
| 1202. City/County Tax/Stamps:     Mortgage        $ | | | | |
| 1203. State Tax/Stamps:     Mortgage        $ | | | 1603.  Minus Total Disbursements<br>to Others (line 1520) | $      196,561.00 |
| 1204. Release/Sat. Recordings | to York County Recorder of Deeds | 206.00 | | |
| 1205. | | | | |
| *1300. ADDITIONAL SETTLEMENT CHARGES* | | | | |
| 1301. Survey | | | 1604.  Equals Disbursements to<br>Borrower (after expiration<br>of any applicable rescission<br>period required by law) | $      81,202.07 |
| 1302. Pest Inspection | | | | |
| 1303. 2007/08 School Taxes | to York County Tax Claim        20-000-PC-0015.K0 | 4,797.50 | | |
| 1304. Interim Tax Bills | to Madeline Harbold | 209.51 | | |
| 1305. 2008 County Taxes | to Madeline Harbold | 1,554.05 | | |
| *1400. TOTAL SETTLEMENT CHARGES  (enter on line 1602)* | | 10,236.93 | | |

The undersigned hereby acknowledge receipt of a completed copy of this statement & any attachments referred to herein.

Lakeside Abstract & Settlements, LLC
Settlement Agent

Certified to be a true copy.

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

|  |  |
|---|---|
| **Borrower:** | Richard A. Miller and Tina A. Miller, husband and wife |
| **Lender:** | LBA Financial Group, Inc. ISAOA |
| **Settlement Agent:** | Lakeside Abstract & Settlements, LLC |
|  | (717)249-0007 |
| **Place of Settlement:** | 101 Front Street, PO Box 426 |
|  | Boiling Springs, PA 17007 |
| **Settlement Date:** | March 17, 2008 |
| **Disbursement Date:** | March 21, 2008 |
| **Property Location:** | 205 Alpat Drive |
|  | Dillsburg, PA 17019 |
|  | York County, Pennsylvania |
|  | 20-000-PC-0015.K0 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_Richard A. Miller_
Richard A. Miller

_Tina A. Miller_
Tina A. Miller

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# EXHIBIT "D"

Document Prepared by:
    Integrity Bank
    3314 Market Street
    Camp Hill, PA 17011

When Recorded, Return to:
    Integrity Bank
    Attention: Holly Davis
    3314 Market Street
    Camp Hill, PA 17011

## SATISFACTION PIECE

Made this 11 day of March, 2008

Name of Mortgagor: Richard A. Miller

Name of Mortgagee: Integrity Bank

Loan Number: 1397401045

Name of Last Assignee:

Date of Mortgage: 1/29/2007

Original Mortgage Debt: $200,000.00

Mortgage Recorded on 2/22/2007 in the Office of the Recorder of Deeds of York County, PA

Book: 1876 Page: 2108 Instrument Number:

Brief Description or State of Location of Mortgaged Premises:

    Parcel #:                  Municipality:

The undersigned hereby certifies that the debt secured by the above-mentioned mortgage has been fully paid or otherwise discharged and that upon the recording hereof said Mortgage shall be and is hereby fully and forever satisfied and discharged.

The undersigned hereby authorizes and empowers the recorder of said county to enter this satisfaction piece and to cause said mortgage to be satisfied of record. Witness the due execution hereof with the intent to be legally bound.

_Holly A. Davis_
Holly Davis Agent of Integrity Bank

County of Cumberland, State of Pennsylvania

On 3/11/08 before me, Gina Skidmore, the Undersigned, Notary Public, personally appeared Holly Davis, who acknowledged him/herself to be the Agent of Integrity Bank, a corporation and that he/she as such being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by themselves as such corporate officer.

WITNESS my hand and official seal.

_Gina Skidmore_
Gina Skidmore, Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Gina Skidmore, Notary Public
Camp Hill Boro, Cumberland County
My Commission Expires May 21, 2011
Member, Pennsylvania Association of Notaries

# EXHIBIT "E"

Document Prepared by:
        Integrity Bank
        3314 Market Street
        Camp Hill, PA 17011

When Recorded, Return to:
        Integrity Bank
        Attention: Holly Davis
        3314 Market Street
        Camp Hill, PA 17011

### SATISFACTION PIECE

Made this 11 day of March, 2008

Name of Mortgagor: Richard A. Miller

Name of Mortgagee: Integrity Bank

Loan Number: 1397401722

Name of Last Assignee:

Date of Mortgage: 2/11/2008

Original Mortgage Debt: $100,000.00

Mortgage Recorded on                in the Office of the Recorder of Deeds of York County, PA

Book:            Page:            Instrument Number:

Brief Description or State of Location of Mortgaged Premises:

        Parcel #:                        Municipality:

The undersigned hereby certifies that the debt secured by the above-mentioned mortgage has been fully paid or otherwise discharged and that upon the recording hereof said Mortgage shall be and is hereby fully and forever satisfied and discharged.

The undersigned hereby authorizes and empowers the recorder of said county to enter this satisfaction piece and to cause said mortgage to be satisfied of record. Witness the due execution hereof with the intent to be legally bound.

_____
Holly Davis Agent of Integrity Bank

County of Cumberland, State of Pennsylvania

On 3/11/08    before me, Gina Skidmore, the Undersigned, Notary Public, personally appeared Holly Davis, who acknowledged him/herself to be the Agent of Integrity Bank, a corporation and that he/she as such being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by themselves as such corporate officer.

WITNESS my hand and official seal.

_____
Gina Skidmore, Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Gina Skidmore, Notary Public
Camp Hill Boro, Cumberland County
My Commission Expires May 21, 2011
Member, Pennsylvania Association of Notaries